Hanna Iron Ore Company v. Commissioner.
Hanna Iron Ore Co. v. Commissioner
Docket No. 36017.
United States Tax Court
1953 Tax Ct. Memo LEXIS 294; 12 T.C.M. (CCH) 405; T.C.M. (RIA) 53127; April 16, 1953
*294 John E. Laughlin, Jr., Esq. 2812 Grant Building, Pittsburgh, Pa., for the petitioner. A. W. Dickinson, Esq., for the respondent. MURDOCK Memorandum Findings of Fact and Opinion The Commissioner determined deficiencies in income tax of the petitioner of $11,458.15 for 1942 and $4,139.58 for 1944. The issues for decision are (1) whether the Hiawatha Mine is one property or several for the purpose of computing a deduction for percentage depletion for 1942; (2) whether the cost, prior to June 1, 1943, of stripping the overburden from a mineral deposit constitutes a capital cost of development recoverable through depletion or is a deferred mining expense which may be amortized over subsequent ore production, and (3), as an alternative to (2), was development completed on April 30 or on May 31. Findings of Fact The petitioner, a Michigan corporation, filed its returns for the taxable years with the collector of internal revenue for the Twenty-third District of Pennsylvania. The petitioner was engaged in the business of operating iron ore mining properties in Michigan and Minnesota at all times material hereto. It called one of its underground mines in Iron County, *295 Michigan, the Hiawatha Mine and included therein 17 adjoining 40-acre tracts in which it had acquired either a fee or leasehold interest, or both, at various dates from 1906 until December 17, 1942. All interests except that in one property had been acquired prior to 1942. It had leases giving it the surface and mining rights to most of the 680 acres but it owned the fee to 40 acres and had a fractional fee interest in other portions of the acreage. The iron ore deposit, consisting of a single formation, which was being mined, underlay portions of only 5 of the 17 tracts. Interests in all of those 5 properties had been acquired prior to 1942. The petitioner mined and removed ore during 1942 from the Hiawatha Mine through two shafts. It was a deep mine and was operated at different levels. The petitioner's plan for the operation of the property was to operate it as a single unit. It had in 1942 only one mine office, one set of maps, one superintendent, one head mine captain, one assistant captain and a boss for each of three shifts. The mining employees, mine machinery and equipment were used throughout the mine. The two shafts were connected on the sixteenth level. Two shafts were *296 used to provide ventilation, two exists in case of an emergency and two hoists in order to maintain production. A single set of books and records was maintained for the mine in which costs were not segregated and in which the only segregation was the tonnages mined from the various tracts in order to compute the royalty payments due under the leases. Ores raised through a shaft were commingled with all other ores raised through that shaft in 1942. The petitioner, on its tax returns for 1942 and other years material hereto, treated the Hiawatha Mine as one property for the purpose of computing and claiming deductions for percentage depletion. The Commissioner, in his examination of the returns for those years, did not disallow any part of the deductions claimed for percentage depletion except for the year 1942 for which he computed the deductions for percentage depletion as if the Hiawatha Mine were three properties. The Hiawatha Mine was one property during 1942 for the purpose of computing a deduction for percentage depletion. The petitioner owned, during the taxable years, an open pit iron ore mine near Hibbing, Minnesota, which it called its Draper Annex Mine. It conducted *297 stripping operations with respect to that mine during the years 1942 and 1943 "to remove the surface material over the body of iron ore." The total cost of the stripping was $432,745.98 of which $166,543,55 was incurred prior to May 1, 1943, and $31,581.07 was incurred during the month of May 1943. The total tonnage of iron ore in the mine before any was removed was 1,948,509 net tons of which 395,283 were removed in 1943 and 486,450 were removed in 1944. "On May 1, 1943, stripping operations at such mine had proceeded to such point where ore was uncovered and ready for production and * * * ore was actually shipped from such mine on June 15, 1943." The Commissioner, in determining the deficiency, "allowed a deduction for the extinguishment of stripping cost with respect to the Draper Annex Mine based upon amortizing only such part of such cost as was incurred from and after May 31, 1943." The record does not show that the development stage of the Draper Annex Mine was completed prior to June 1, 1943. All facts stipulated by the parties are incorporated herein by this reference. Opinion MURDOCK, Judge: The first question relates only to the year 1942. It is whether the Hiawatha *298 Mine is to be treated as one property for the purpose of computing percentage depletion. The position of the Commissioner on this point is weak and inconsistent. He computed the depletion allowance for 1942 as if there were three properties, one consisting of three 40-acre tracts in which the petitioner owned two separate leasehold interests and the ore from which was removed through shaft No. 2, another, a 40-acre tract, which the petitioner owned in fee, and finally another tract in which the interest of the petitioner was one-fourth fee and three-fourths leasehold, the ore from both of which tracts was removed through shaft No. 1. It is stipulated that if he had computed the total allowance for percentage depletion, treating the Hiawatha Mine as five properties, that is, by treating each leasehold and fee interest separately, the amount would have been the same as that allowed, and he argues that the five properties are separate although he still purports to find some aid in the fact that there were two shafts. This mine covered all of a single deposit of ore which the petitioner was mining in one single operation. The purpose of two shafts has been adequately explained and is *299 not inconsistent with the petitioner's contention that it is a single property for the purpose of computing percentage depletion. The only segregation in the accounts is to show the tons of ore mined from each separate property so that payments under the leases can be computed and paid. No other regard is paid to the separate tracts either in the operation of the mine or in the books and records of account maintained for the mine. It does not appear how the Commissioner made his separate computations from the books and records of the mine in view of the evidence as to how they were kept. The petitioner has consistently claimed deductions for percentage depletion from the mine on the theory that it is but one property. The method of the petitioner, under such circumstances, was correct and the Commissioner had no authority to depart from it by computing the allowances for percentage depletion as if there were several properties. Amherst Coal Company, 11 T.C. 209; Black Mountain Corporation, 5 T.C. 1117. The petitioner next contends that a taxpayer which operates an open pit iron ore mine is entitled to treat stripping expense prior to actual ore production *300 as a deferred operatng expense to be amortized over subsequent production of iron ore. It cites no authority but argues that such a mine has no period of development corresponding to that of an underground mine, as to which latter it has been uniformly held that expenditures for the period of development must be capitalized and recovered through cost depletion. The facts of record are too meager to permit the Court to consider and decide any such question. It has no actual knowledge and can not take judicial knowledge of what happens generally in the case of similar mines or what actually happened in this case, except for the information supplied by the stipulation of facts, the material portions of which have been set forth in full in the findings of fact. The facts of record do not permit the Court to determine what similarity, if any, there was between the stripping operations, prior to June 1, 1943, and the development stage of underground mines. The petitioner failed to sustain its burden of proof on this issue. The petitioner next contends, in the alternative only, that the development stage ended on May 1, 1943 because the stripping operations had proceeded by that time to *301 the point where ore was uncovered and ready for production. Mineral is sometimes actually produced during the development stage of a mine. Here all we know is that it was uncovered and ready for production. The Court would still be in the dark even if it knew that some ore had actually been produced and shipped prior to May 1, 1943 because it might have been shipped as an incident of the development. That was true in a number of the cases cited, all of which may have involved only underground mines. The Commissioner's regulations recognize that mineral may be produced and sold during the development period of a mine. Section 29.23(m)-15 of Regulations 111 provides: "All expenditures in excess of net receipts from minerals sold shall be charged to capital account recoverable through depletion while the mine is in the development stage. The mine will be considered to have passed from a development to a producing status when the major portion of the mineral production is obtained from workings other than those opened for the purpose of development, or when the principal activity of the mine becomes the production of developed ore rather than the development of additional ores for mining. *302 " See Senate Committee on Finance Supplemental Report, (1951) S. Rept. 781, Part 2, 82d Cong. 1st Sess. 309, C.B. 1951-2, 545, 558; House Committee on Ways and Means Report, (1951) H. Rept. 586, 82d Cong. 1st Sess. 302, C.B. 1951-2, 357, 379. The petitioner cites no authority on this point. Again, the Court has inadequate proof on which to sustain the petitioner's contention. Decision will be entered under Rule 50.